## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| PETER VOTTO, derivatively on behalf of DIGITAL TURBINE, INC.<br><br>      Plaintiff,<br><br>v.<br><br>WILLIAM STONE, BARRETT GARRISON, ROBERT DEUTSCHMAN, ROY CHESTNUTT, HOLLY HESS GROOS, MOHAN GYANI, JEFFREY KARISH, MICHELLE STERLING, and MOLLIE SPILMAN,<br><br><br>      Defendants,<br><br>DIGITAL TURBINE, INC.<br><br>      Nominal Defendant. | CASE NO.   1:22-cv-00944<br><br><br>JURY TRIAL DEMANDED |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Peter Votto ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Digital Turbine, Inc. ("Digital Turbine" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants William Stone, Barrett Garrison, Robert Deutschman, Roy Chestnutt, Holly Hess Groos, Mohan Gyani, Jeffrey Karish, Michelle Sterling and Mollie Spilman (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Digital Turbine, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following against the Individual Defendants based upon personal

knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, transcripts of conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Digital Turbine news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the United States District Court for the Western District of Texas, captioned *Robison v. Digital Turbine, Inc., et al., No* 1:22-cv-550 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Digital Turbine against certain of its officers and directors seeking to remedy the Defendants' violations of law that have occurred from August 9, 2021 through May 17, 2022 (the "Relevant Period") and have caused, and continue to cause, substantial harm to Digital Turbine and its shareholders, including monetary losses and damages to Digital Turbine's reputation and goodwill.

2.      Digital Turbine is a provider of end-to-end solutions for mobile technology companies to enable advertising and monetization solutions. The Company's digital media platform powers end-to-end applications for brand discovery and advertising, user acquisition and engagement, operational efficiency, and monetization opportunities. On April 29, 2021, Digital Turbine acquired in-app marketplace provider AdColony Holdings AS ("AdColony"), and on May 25, 2021, Digital Turbine acquired mobile monetization platform Fyber N.V. ("Fyber").

3.      On May 17, 2022, Digital Turbine issued a press release revealing that it will

"restate its financial statements for the interim periods ended June 30, 2021, September 30, 2021, and December 31, 2021, following a review of the presentation of revenue net of license fees and revenue share for the Company's recently acquired businesses."

4.      In response to this news, on May 18, 2022, the Company's shares plummeted $1.93, or 7.1%, to close at $25.28 per share on unusually heavy trading volume.

5.      Throughout the Relevant Period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company's acquisitions, Ad Colony and Fyber, function as agents in portions of their respective product lines; (2) that, as a consequence, revenues for those product lines are required to be reported net of license fees and revenue share, as opposed to gross; (3) that the Company's internal control over financial reporting as to revenue recognition was inadequate; (4) the Company's net revenues was overstated throughout fiscal 2022; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      Making matters worse and before investors and the public learned of this crushing news, two Officer Defendants Stone and Garrison (collectively "Insider Trading Defendants"), sold thousands of shares for millions of dollars while in possession of non-public information as to inadequacies of the procedures and policies of financial reporting with respect to revenue recognition.

7.      As a result of the foregoing, Digital Turbine has been named a defendant in a federal securities class action lawsuit of investors who allege they were damaged when they purchased Digital Turbine shares during the Relevant Period.

8.      The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company. The Individual Defendants' wrongful conduct will likely cost the Company millions of dollars going forward.

9.      The Individual Defendants knowingly or recklessly breached fiduciary duties and caused other misconduct that substantially damaged the Company.

10.     Given the considerable insider selling by at least two insiders along with other misconduct,  a majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence because there is a substantial likelihood that the Individual Defendants, most of whom are the Company's current directors, engaged in fraud and misconduct, and are liable in this derivative action and the Securities Litigation.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act of 1934.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has personal jurisdiction over each defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an individual residing in this District, and/or is an individual non-resident who has sufficient

minimum contacts with this District to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Digital Turbine maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

16.    Plaintiff Peter Votto is a shareholder of Digital Turbine common stock. Plaintiff has continuously held Digital Turbine common stock since February 2020.

### Nominal Defendant Digital Turbine

17.    Nominal Defendant, Digital Turbine, is a Delaware corporation with principal executive offices in Austin, TX.

18.    Digital Turbine's shares trade on the NASDAQ under the ticker symbol "APPS."

### Current Officer Defendants

### Defendant William Stone

19.    Defendant William Stone ("Stone") was appointed as the Company's Chief Executive Officer ("CEO") in 2014 and a director of the Company in 2015 and remained CEO and director through the Relevant Period.

20.    According to the Company's Schedule 14A filed with the SEC on July 29, 2021, (the "2021 Proxy Statement"), Defendant Stone beneficially owned 2,265,462 shares of the

Company's stock. Based upon the closing price of the Company's stock on July 22, 2021, Defendant Stone beneficially owned $143,471,708.46 of Digital Turbine stock.

21.    For the fiscal year ended March 31, 2021, Defendant Stone received $2,297,870 in compensation from the Company. This includes $550,000 in salary, $165,000 in bonus, $572,200 in non-equity incentive plan compensation, $500,000 in stock awards, $485,294 in option awards and $25,376 in all other compensation.

22.    The Company's 2021 Proxy Statement stated the following about Defendant Stone:

> Mr. Stone became our Chief Executive Officer in October 2014 and was appointed to the Board in January 2015, prior to which Mr. Stone had served from November 2013 as President and Chief Operating Officer of the Company. From August 2012 to November 2013, Mr. Stone served as the Chief Executive Officer of the Company's wholly-owned subsidiary, Digital Turbine, Inc. Mr. Stone was previously Senior Vice President of Qualcomm Inc. and President of its subsidiary FLO TV Inc. from 2009 to 2011. Prior to Qualcomm, Mr. Stone was the CEO and President of the smartphone application storefront provider, Handango (acquired by Appia Inc.), from 2007 to 2009. Mr. Stone has extensive global experience in wireless, technology, mobile content, marketing and distribution, having held executive positions at several operators such as Verizon, Vodafone, and AirTouch. Mr. Stone has a B.A. and M.B.A. from Rice University. Mr. Stone was nominated based on his position as our Chief Executive Officer and his extensive experience in our industry.

23.    During the Relevant Period, Defendant Stone made the following sales of Company stock:

| Sale Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/15/2021 | 72,879 | $53.76 | $3,917,975.04 |
| 3/2/2022 | 50,000 | $46.03 | $2,301,500.00 |
| 3/2/2022 | 20,271 | $46.87 | $950,101.77 |
| 3/2/2022 | 24,405 | $53.76 | $1,312,012.80 |
| 3/2/2022 | 1,477 | $46.40 | $68,532.80 |
| 4/1/2022 | 774 | $43.81 | $33,908.94 |
| 5/2/2022 | 774 | $31.65 | $24,497.10 |
| Total | 170,580 | Total Proceeds | $8,608,528.45 |

**Defendant Barrett Garrison**

24.    Defendant Barrett Garrison ("Garrison") has served as Executive Vice President and Chief Financial Officer at all relevant times (2016-Present). According to the 2021 Proxy Statement, Defendant Garrison beneficially owned 1,055,838 shares of the Company's stock. Based upon the closing price of the Company's stock on July 22, 2021, Defendant Garrison beneficially owned $66,866,220.54 of Digital Turbine stock.

25.    For the fiscal year ended March 31, 2021, Defendant Garrison received $1,081,091 in compensation from the Company. This includes $350,000 in salary, $70,000 in bonus, $242,700 in non-equity incentive plan compensation, $200,000 in stock awards, $194,118 in option awards and $24,273 in all other compensation.

26.    The Company's 2021 Proxy Statement stated the following about Defendant Garrison:

> Mr. Garrison became our Executive Vice President and Chief Financial Officer in September 2016. Prior to joining the Company, Mr. Garrison was the Chief Financial Officer of Competitor Group, Inc., a media and event company in the active lifestyle industry, from March 2014 to March 2015; the Chief Financial Officer of Netspend, a division of TSYS Company (NYSE: TSS), a leading provider of reloadable prepaid debit cards, from June 2013 to March 2014, and the Treasurer/VP of Finance from October 2008 to June 2013. Prior to his Netspend position, Mr. Garrison served in senior financial roles at Dell Financial Services, Seiko Instruments International and Austaco, Inc. Mr. Garrison holds an M.B.A. with a concentration in Finance and a B.B.A. in Finance from St. Edwards University and The University of New Mexico, Robert O. Anderson School of Management, respectively.

27.    During the Relevant Period, Defendant Garrison made the following sales of Company stock:

| Sale Date | Shares Sold | Price | Proceeds |
|-----------|-------------|-------|----------|
| 12/15/2021 | 58,920 | $53.76 | $3,167,539.20 |
| 1/1/2022 | 411 | $60.99 | $25,066.89 |
| 2/1/2022 | 367 | $44.15 | $16,203.05 |
| 3/1/2022 | 396 | $48.48 | $19,198.08 |
| 4/1/2022 | 454 | $43.81 | $19,889.74 |
| 5/2/2022 | 391 | $31.65 | $12,375.15 |
| **Total** | 60,939 | **Total Proceeds** | $3,260,272.11 |

**Current Director Defendants**

**Defendant Robert Deutschman**

28.    Defendant Robert Deutschman ("Deutschman") has served as Chairman of the Board at all relevant times (2014-Present). In addition, he served as Chairman of the Audit Committee and a member of Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, Defendant Deutschman beneficially owned 718,799 shares of the Company's stock. Based upon the closing price of the Company's stock on March 22, 2021, Defendant Deutschman beneficially owned $45,521,540.70 of Digital Turbine stock.

29.    For the fiscal year ended March 31, 2021, Defendant Deutschman received $234,500 in compensation from the Company. This includes $87,250 in fees earned or paid in cash and $147,250 in stock awards.

30.    The Company's 2021 Proxy Statement stated the following about Defendant Deutschman:

 Mr. Deutschman joined our Board in May 2013 and was appointed Chairman of the Board in December 2014. Mr. Deutschman joined Focal Point Partners LLC, an investment bank, as a Managing Director in January 2020. Prior to that time, Mr. Deutschman held various positions with the Cappello Group, Inc., a merchant bank, since 1999, serving as Vice Chairman since 2008. Prior to joining Cappello, Mr. Deutschman was a Managing Director of Saybrook Capital Corp., and a Senior Vice President at Houlihan, Lokey. Mr. Deutschman served as the Vice Chairman of the Board of Directors of Enron Creditors Recovery Corp. (formerly Enron

Corp.) from 2004 to 2014, a position he assumed upon Enron's 2004 emergence from bankruptcy. Mr. Deutschman serves on the boards of Poseidon Resources, a private water project development company, and the RAND Center for Corporate Ethics and Governance. He previously served on the boards of MPG Office Trust Inc., a public real estate investment trust, First Bank of Beverly Hills, and the Brookfield DTLA Fund Office Trust Investor, Inc. Mr. Deutschman holds a B.A. from Haverford College, with honors, and a J.D. from Columbia University School of Law, where he was a Harlan Fiske Stone scholar. Mr. Deutschman was nominated based on the entirety of his experience and skills, although the Board noted specifically his extensive investment banking and financial experience and background in strategic advising, mergers and acquisitions and capital raising for institutions and private companies.

**Defendant Roy Chestnutt**

31.     Defendant Roy Chestnutt ("Chestnutt") has served on the Audit Committee at all relevant times (2018-Present). According to the 2021 Proxy Statement, Defendant Chestnutt beneficially owned 104,056 shares of the Company's stock. Based upon the closing price of the Company's stock on March 22, 2021, Defendant Chestnutt beneficially owned $6,589,866.48 of Digital Turbine stock.

32.     For the fiscal year ended March 31, 2021, Defendant Chestnutt received $150,000 in compensation from the Company. This includes $55,000 in fees earned or paid in cash and $95,000 in stock awards.

33.     The Company's 2021 Proxy Statement stated the following about Defendant Chestnutt:

Mr. Chestnutt joined our Board in June 2018. Since November 2017, Mr. Chestnutt has engaged in providing consulting services. From January 2013 to November 2017, Mr. Chestnutt served as Executive Vice President and Chief Strategy Officer of Verizon Communications Inc. (NYSE: VZ) and Verizon Nederland B.V. Mr. Chestnutt was responsible for development and implementation of Verizon's overall corporate strategy, including business development, joint ventures, strategic investments, acquisitions and divestitures. Before being named to that position, he was Senior Vice President — Corporate Strategy, with responsibility for the formulation and execution of Verizon's strategic plan addressing new markets, solution areas and services that capitalize on the company's assets, capabilities and brand across all lines of business.

Mr. Chestnutt joined Verizon in 2011 from Motorola Networks where he served as corporate vice president of the Americas and helped lead the successful transition of the business unit to new ownership by Nokia Siemens Networks. Previously, Mr. Chestnutt was Chairman and Chief Executive Officer of Grande Communications, a facilities-based, "triple-play" communications provider in Texas. His responsibilities included leading the transition of Grande Communications from startup to a full service, market-driven company, which resulted in the successful sale of the company. Prior to joining Grande, Mr. Chestnutt was the senior vice president of National Field Sales and General Business for Sprint-Nextel. From 2000 to 2005, he held positions at Nextel Communications as regional vice president of the Southwest in Austin and of the West in the San Francisco Bay Area. Mr. Chestnutt also has general management experience with PrimeCo Personal Communications and AirTouch Cellular. Mr. Chestnutt has been a non-executive director of Telstra, Australia's leading telecommunications and technology company. He also served on the boards of directors of the international industry association GSMA, Saudi Telecom, Boingo, and is a former chair of the Chief Strategy Officers Group including 25 global strategists from the world's leading wireless carriers. Mr. Chestnutt holds an MBA from the University of San Francisco, and a B.S. in Business Administration from San Jose State University. Mr. Chestnutt was nominated based on the entirety of his experience and skills, although the Board noted specifically his broad knowledge of the wireless industry and extensive industry relationships.

### **Defendant Holly Hess Groos**

34.    Defendant Holly Hess Groos ("Groos") was appointed as a director and Audit Committee member on May 4, 2021. According to the 2021 Proxy Statement, Defendant Groos received no director compensation during the fiscal year ended March 31, 2021.

35.    The Company's 2021 Proxy Statement stated the following about Defendant Groos:

Ms. Groos joined our Board in May 2021. Ms. Groos currently serves as an external advisor for the Performance Improvement and Telecommunications practice of Bain & Company, and has served in that position since April 2020. From 1990 to March 2020, Ms. Groos served in senior financial roles within Verizon, including Senior Vice President of Business Excellence and Zero Based Budgeting of Verizon from 2018 to March 2020, Senior Vice President and Chief Financial Officer of Verizon Media (AOL and Yahoo!) from 2015 to 2018, Senior Vice President and Chief Financial Officer of Verizon Wireless from 2013 to 2015, and Senior Vice President positions as head of Operational Excellence, head of Internal Audit and Treasurer. Ms. Groos currently serves on the Board of Directors for the Council for Economic Education, the mission of which is to provide financial literacy and education to students. Mr. Groos received a Bachelor of Science (Business Administration/Accounting) from Miami University of Ohio and is a

certified public accountant. The Board appointed Ms. Groos to serve as a director based on the entirety of her experience and skills, including her strategic financial leadership, business operational process experience, and extensive knowledge of the wireless technology industry.

**Defendant Mohan S. Gyani**

36.     Defendant Mohan S. Gyani ("Gyani") has served as a director at all relevant times (2016-Present). In addition, Defendant Gyani has served as Chair of the Governance Committee and member of the Compensation and Human Capital Management Committee. According to the 2021 Proxy Statement, Defendant Gyani beneficially owned 448,925 shares of the Company's stock. Based upon the closing price of the Company's stock on March 22, 2021, Defendant Gyani beneficially owned $28,430,420.25 of Digital Turbine stock.

37.     For the fiscal year ended March 31, 2021, Defendant Gyani received $154,750 in compensation from the Company. This includes $57,375 in fees earned or paid in cash and $97,375 in stock awards.

38.     The Company's 2021 Proxy Statement stated the following about Defendant Gyani:

Mr. Gyani joined our Board in January 2016. Mr. Gyani has been a private investor since 2005 and sits on the Boards of public and private companies. From 2000 to 2003, Mr. Gyani served as president and chief executive officer of AT&T Wireless Mobility Services, Inc., a telecommunications company, and as senior advisor to the chairman and chief executive officer through 2004. From 1995 to 1999, Mr. Gyani was executive vice president and chief financial officer of AirTouch Communications, Inc., a wireless telephone service provider. Upon the acquisition of AirTouch by Vodafone, Mr. Gyani served as executive director on the board of Vodafone AirTouch and as its head of strategy and M&A until July 1999. Prior to AirTouch Communications, Mr. Gyani spent 15 years with Pacific Telesis Group, Inc., parent of Pacific Bell, a telecommunications company, where he held various financial and operational positions. Mr. Gyani serves as a member of the board of directors of Synchronoss Technologies, Inc. (NASDAQ: SNCR), a provider of cloud, digital, messaging, and Internet of Things (IoT) platforms, products, and solutions. Mr. Gyani was formerly a member of the Board of Blackhawk Network Holdings, Inc. (NASDAQ: HAWK), a provider of prepaid payments products; IDEA Cellular, a wireless service provider; MUFG Union Bank, N.A and its financial holding company, MUFG Americas Holdings Corporation; and Mobileum Inc., a provider of roaming services and telco big data analytics solutions

to mobile network operators in the United States and internationally. From March 2011 to July 2015, Mr. Gyani served as a director of Audience, Inc., a provider of intelligent voice and audio solutions, and as chairman from August 2011 to July 2015; from June 2007 to June 2010, he served on the board of directors of Mobile Telesystems, Inc., a cell phone operator; from March 2002 to August 2013, he served on the board of directors of Keynote Systems, Inc., a mobile and web cloud testing and monitoring company; and from October 2004 to February 2015, he served on the board of directors of Safeway, Inc., a retail food and drug company. Mr. Gyani holds a B.A. and an M.B.A. from San Francisco State University. Mr. Gyani was nominated based on the entirety of his experience and skills, although the Board noted specifically his broad knowledge of the wireless industry, extensive industry relationships, and deep experience serving on public and private company boards.

**Defendant Jeffrey Karish**

39.     Defendant Jeffrey Karish ("Karish") has served as a director at all relevant times (2013-Present). In addition, Defendant Karish has served as Chair of Compensation and Human Capital Management Committee. According to the 2021 Proxy Statement, Defendant Karish beneficially owned 308,600 shares of the Company's stock. Based upon the closing price of the Company's stock on March 22, 2021, Defendant Karish beneficially owned $19,543,638 of Digital Turbine stock.

40.     For the fiscal year ended March 31, 2021, Defendant Karish received $151,500 in compensation from the Company. This includes $55,750 in fees earned or paid in cash and $95,750 in stock awards.

41.     The Company's 2021 Proxy Statement stated the following about Defendant Karish:

Mr. Karish has been a member of our Board since May 2013. Mr. Karish is a member of the leadership team at the Heritage Group, a private holding and investment company with an emphasis on healthcare and medical research. Mr. Karish was the former President of Windsor Media LLC, subsequent to having served as the company's Executive Vice President and acting General Counsel, with a focus on investing and finance which included private equity funding, early stage venture capital funding and general investment management. Previously, Mr. Karish was Head of Media Strategy and Corporate Development at Yahoo with

12

a primary focus in strategic growth initiatives and M&A. Prior to Yahoo, he was a management consultant at McKinsey & Company and a key member of McKinsey's West Coast Media and Technology practice. Mr. Karish was formerly a member of the Board of Banc of California. Mr. Karish holds a J.D. from Harvard University, a M. Phil. in International Relations from Cambridge University, and a B.A. in History from UC Berkeley. Mr. Karish was nominated based on the entirety of his experience and skills, although the Board noted specifically his extensive management and financial experience and background in strategic advising and mergers and acquisitions for companies.

**Defendant Michelle Sterling**

42.    Defendant Michelle Sterling ("Sterling") has served as a director at all relevant times (2019-Present). In addition, Defendant Sterling has served as a member of the Compensation and Human Capital Management Committee and the Governance Committee. According to the 2021 Proxy Statement, Defendant Sterling beneficially owned 32,530 shares of the Company's stock. Based upon the closing price of the Company's stock on March 22, 2021, Defendant Sterling beneficially owned $ 2,060,124.90 of Digital Turbine stock.

43.    For the fiscal year ended March 31, 2021, Defendant Sterling received $145,750 in compensation from the Company. This includes $52,875 in fees earned or paid in cash and $92,875 in stock awards.

44.    The Company's 2021 Proxy Statement stated the following about Defendant Sterling:

> Ms. Sterling joined our Board in June 2019. Since 2020, Ms. Sterling has engaged in Human Resources consulting. From 1994 to 2020 Ms. Sterling served in various capacities at Qualcomm, Inc. ("Qualcomm") (NASDAQ: QCOM) and had been Executive Vice President of Human Resources at Qualcomm since 2015. Previously, she was SVP, Human Resources at Qualcomm. Throughout her tenure with Qualcomm, Ms. Sterling supported Qualcomm's strategies in complex transactions including joint ventures and divestitures. Ms. Sterling had direct responsibility for more than 33,000 Qualcomm employees worldwide and served as a member of Qualcomm's executive committee. She formally served on the executive committee and board of directors of San Diego Regional Economic Development Corporation, executive committee of the Corporate Directors Forum, and previously was a board member for Girl Scouts San Diego, chair of the board

of directors of Serving Seniors, vice-chair of the board of directors and chair of the advisory council of Occupational Training Services, and chair of the corporate board of directors for the San Diego Workforce Partnership. Ms. Sterling holds a B.S. in Business Management from the University of Redlands. Ms. Sterling was nominated based on the entirety of her experience and skills, although the Board noted specifically her wide-ranging technology experience, knowledge, and understanding of global organizational structures and human capital management.

### Defendant Mollie Spilman

45.     Defendant Mollie Spilman ("Spilman") was appointed to the Board of Directors as an independent director on February 1, 2022. The Company's Form 8-K filed with the SEC on February 2, 2022, stated the following about Defendant Spilman:

Ms. Spilman joined Oracle in 2019 and is currently the Chief Revenue Officer of its Advertising and Marketing Cloud businesses. Mollie has responsibility for all revenue and operations functions for these businesses and has direct responsibility for more than 1,200 Oracle employees worldwide.

Previously Mollie held the role of Chief Operating Officer at Criteo, leading all commercial functions globally including sales, publisher development, operations, marketing, and business development. She joined Criteo in 2014, and in her tenure was instrumental in growing Criteo to a $2+ billion business with a 90% client retention rate. Prior to Criteo, her career in advertising included executive roles at AOL, Yahoo, Discovery and Time Warner.

Mollie has won many awards over the years including the IAB Service Excellence Award and was ranked the fifth most powerful woman in mobile advertising by Business Insider. Spilman holds a bachelor's degree in English Literature from Trinity College, Hartford, Connecticut.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

46.     By reason of their positions as officers, directors and/or fiduciaries of Digital Turbine and because of their ability to control the business and corporate affairs of Digital Turbine, the Individual Defendants owed Digital Turbine and its shareholders' fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Digital Turbine in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of

Digital Turbine and its shareholders to benefit all shareholders equitably; and not to act in furtherance of the Individual Defendants' own personal interest or benefit.

47.    Each director and officer of the Company owes Digital Turbine and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of the Company's property and assets, and the highest obligations of fair dealing.

48.    As fiduciaries of Digital Turbine, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their positions of control and authority as directors and/or officers of the Company.

49.    In order to discharge their duties, the officers and directors of Digital Turbine were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

50.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care, and diligence in the management and administration of the affairs of the Company and in the use and preservation of the Company's property and assets. As Digital Turbine's directors and officers, the Individual Defendants were aware or should have been aware that their conduct, complained of herein, posed a risk of serious injury to the Company because the Individual Defendants knowingly and culpably acted in violation of their fiduciary obligations, with an absence of good faith on their part, and with a conscious disregard for their duties owed to Digital Turbine and its shareholders.

51.    The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial

condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

52.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things the Individual Defendants were required to:

i.    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, the United States, and pursuant to Digital Turbine's own Code of Business Conduct and Ethics (the "Code of Conduct");

ii.   conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

iii.  remain informed as to how Digital Turbine conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection in addition to that, and to take steps to correct such conditions or practices;

iv.   establish and maintain systematic, accurate records and reports of the business and internal affairs of Digital Turbine and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

v.    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Digital Turbine's operations would comply with all laws and Digital Turbine's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

    vi.     exercise reasonable control and supervision over Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

   vii.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

  viii.     examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

53.     Each of the Individual Defendants further owed Digital Turbine and the shareholders the duty of loyalty, requiring that each favor Digital Turbine's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

54.     At all times relevant hereto, the Individual Defendants were the agents of each other and Digital Turbine and were at all times acting within the course and scope of such agency.

55.     The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Digital Turbine.

56.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over both the wrongful acts complained of herein, and the contents of the various public statements issued by Digital Turbine.

**A. Digital Turbine's Code of Conduct**

57.     The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Digital Turbine's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states the following with respect to the responsibilities of the Board:

1. They must always promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest in personal and professional relationships.

2. They must not use their position for personal gain, such as by soliciting or accepting for personal benefit business opportunities that might otherwise accrue to the benefit of the Company.

3. They must provide the Securities and Exchange Commission, the public and other constituents with reports, documents and information that is full, fair, accurate, complete, objective, relevant, timely and understandable.

4. They must comply with applicable rules and regulations of federal, state, provincial, local and foreign governments, and other appropriate private and public regulatory agencies.

5. They must act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.

6. They must respect the confidentiality of information acquired in the course of their work, except when authorized or otherwise legally obligated to disclose the information.

7. They should proactively promote ethical behavior as a responsible partner among peers in their work environment and community.

8. They must responsibly use and control all assets and resources employed or entrusted to them.

9. They must, before creating online content and social media content, consider the potential impact their actions, personal statements or expressions of their personal opinions or beliefs can have on the business, operations and reputation of the Company. They are solely responsible for what they generate or post online, including via social media. Any of their conduct that adversely affects their job performance, the performance of fellow employees or contractors, or otherwise adversely affects stockholders, directors, employees, customers, vendors, or other Company stakeholders or the Company's business, operations, reputation or legitimate business interests may result in disciplinary action up to and including termination or removal.

   In the rapidly expanding world of electronic communication, social media can mean many things. For purposes of this Code, "social media" includes all means of communicating or posting information or content of any sort on the Internet, including to an officer's, director's or employee's own or someone else's web log or blog, journal or diary, personal web site, social networking or affinity

web site, web bulletin board or a chat room, and instant messaging, whether or not associated or affiliated with the Company, as well as any other form of electronic communication. A few examples of popular applications include Instagram, Snapchat, Facebook, LinkedIn, Pinterest, YouTube, Twitter, Tik Tok and Wikipedia.

10. They must act in a manner consistent with the Company's culture, workforce initiatives, and hostile-free work environment.

11. They must not take any action to fraudulently influence, coerce, manipulate, or mislead any auditor engaged in the performance of an audit for the purpose of rendering the financial statements materially misleading.

12. They must promptly report Code violations and suspected illegal, unethical or otherwise dishonest activities to the Chief Executive Officer and Chairman of the Board. The Chief Executive Officer and Chairman of the Board must promptly investigate all such reports. Persons making such reports shall not be retaliated against for doing so. The Chief Executive Officer and Chairman of the Board shall present the results of their investigation to the Board of Directors. If the alleged violation was committed by an officer of the Company, they shall also report the results of their investigation to the Audit Committee of the Board of Directors at its next meeting. The Chief Executive Officer and the Audit Committee shall each be empowered to take merited punitive or corrective action, which may include termination of employment. If you wish to remain anonymous you can use the Anonymous Global Ethics and Compliance Hotline www.lighthouseservices.com/digitalturbine or 844-420-0044(US and Canada) 800-603-2869 (all other countries, please include country access code first).

**B. Digital Turbine's Audit Committee Charter**

58.    In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Deutschman, Chestnutt, and Groos (the "Audit Committee Defendants") owed specific additional duties to Digital Turbine. The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of its activities to the Board and preparing and certification of the Company's financial statements to guarantee the independent auditors' report, or to guarantee other disclosures by the Company, among other things:

To fulfill its responsibilities and duties, the Committee shall:

General

- Review the Company's annual and quarterly financial statements and any other relevant reports or other financial information.

- Review the regular internal financial reports prepared by management.

- Select the independent accountants and approve the fees and other compensation to be paid to the independent accountants.

- Pre-approve all audit and permitted non-audit services to be performed by the independent accountants.

- Review and ensure the independence of the independent accountants. This review shall cover and include services, fees, quality control procedures and a formal written statement from the independent auditors regarding relationships between the independent auditors and the Company, consistent with applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence.

- Review the performance of the independent accountants and discharge the independent accountants if and when circumstances warrant.

- Following completion of the annual audit, review separately with the independent accountants and management any problems or difficulties encountered during the course of the audit.

- Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters.

- Establish procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

Oversight of Annual Audit and Quarterly Reviews

- Review with management and the Company's independent auditors the following information, which is required to be reported by the independent auditor:

    o  all critical accounting policies and practices to be used;

    o  all alternative treatments of financial information that have been

discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors;

o  all other material written communications between the independent auditors and management, such as any management letter and any schedule of unadjusted differences; and

o  any material financial arrangements of the Company which do not appear on the financial statements of the Company.

- Resolve all disagreements between the Company's independent auditors and management regarding financial reporting.

Oversight of Financial Reporting Process and Internal Controls

- Review:

o  the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, through inquiry and discussions with the Company's independent auditors and management;

o  the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K.

- Review with the chief executive officer, chief financial officer and independent auditors, periodically, the following:

o  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

o  any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

- Review and discuss with the independent auditors the results of the year-end audit of the Company, including any comments or recommendations of the Company's independent auditors and, based on such review and discussions and on such other considerations as it determines appropriate,

recommend to the Board whether the Company's financial statements should be included in the Company's Annual Report on Form 10-K.

- Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies (which review may be done generally (i.e., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance).

Miscellaneous

- Establish and implement policies and procedures for the Committee's review and approval or disapproval of proposed transactions or courses of dealings with respect to which executive officers or directors or members of their immediate families have an interest (including all transactions required to be disclosed by Item 404(a) of Regulation S-K) on an on-going basis.

- Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

- Review the Company's program to monitor compliance with the Company's Code of Business and Ethical Conduct and meet periodically with management to discuss compliance with the Code of Business and Ethical Conduct.

- Review this Charter at least annually and recommend any changes to the Board.

### C. Regulation FD Policy

59.      In addition to these duties, the Company issued a whistle-blower policy aimed to safeguard the interest of the public and its shareholders by prohibiting the selective disclosure of material, non-public information. The policy states the procedures by which to submit and report violations. In particular, it states the following:

Regulation FD requires that, whenever the Company (or a person acting on its behalf) intentionally discloses material nonpublic information to certain specified persons (including broker-dealers, analysts and securityholders), the Company

must simultaneously disseminate the information to the public in a manner consistent with Regulation FD.

Examples of activities affected by this Policy include:

- Earnings releases and related conference calls.

- Speeches, interviews and conferences.

- Responding to market rumors.

- Reviewing analyst reports.

- Referring to or distributing analyst reports on the Company.

- Analyst and investor visits.

- Postings on the Company's websites.

- Social media communications, including through corporate blogs, employee blogs, chat boards, Twitter, Facebook, LinkedIn, YouTube and any other non-traditional means of communication.

If the Company learns that it (or certain persons acting on its behalf) has unintentionally disclosed material nonpublic information, the Company must promptly publicly disseminate the information no later than 24 hours after discovering the unintentional disclosure or at the opening of trading on the NASDAQ Stock Market, LLC (the "NASDAQ"), whichever is later. The Company adopted this Policy to ensure that any persons acting on its behalf comply with Regulation FD. This Policy applies to every director and employee of the Company and its subsidiaries, and complements the Company's Insider Trading Policy. This Policy shall be administered by the Company's Chief Financial Officer (hereinafter, and together with any successor administrator appointed by the Company and any person the Chief Financial Officer or successor Compliance Officer shall designate to assist in the performance of his or her duties, the "Compliance Officer").

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.    In committing the wrongful acts alleged herein, the Individual Defendants have

pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

62.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. Each Individual Defendant described herein was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of here because the actions described herein occurred under the authority and approval of the Board.

63.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware

of his or her overall contribution to and furtherance of the wrongdoing.

64.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Digital Turbine and was at all times acting within the course and scope of such agency.

## **FACTUAL BACKGROUND**

65.    Digital Turbine is a mobile growth platform that improves the landscape for advertisers, publishers, carriers, and device original equipment manufacturers. The Company offers end-to-end products and solutions leveraging proprietary technology to all participants in the mobile application arena, enabling brand discovery and advertising, user acquisition and engagement, and operational efficiency for advertisers.

66.    The acquisition of AdColony and Fyber were critical components of Digital Turbine's strategy to provide an end-to-end solution for mobile brand acquisition, advertising, and revenue monetization.

67.    AdColony is a mobile advertising platform servicing advertisers and publishers. With the acquisition of AdColony, the Company increased its collective experience, reach, and portfolio of capabilities to serve mobile advertisers and publishers. On April 29, 2021, the Company completed the acquisition of AdColony.

68.    Fyber is a mobile ad monetization platform that enables app developers to maximize profits through advertising. Fyber's patented technology platform and experience in mediation, real-time bidding, advanced analytics tools, and video combine to provide a highly value app monetization solution to publishers and advertisers. Fyber is a crucial and vital complement to the Company's ambition to become one of the industry's independent mobile advertising solutions.  On May 25, 2021, Company completed the acquisition of Fyber.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

69.     On August 9, 2021, Digital Turbine announced its first quarter 2022 financial results in a press release that stated, in relevant part:

70.     **Recent Financial Highlights:**

- Fiscal first quarter of 2022 revenue totaled $212.6 million. On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal first quarter of 2022 was $292.0 million, representing a 104% increase year-over-year as compared to the comparable pro forma figure for the fiscal first quarter of 2021.

\* \* \*

"***We are off to a fast start in fiscal 2022 with more than 100% year-over-year pro forma revenue growth and more than 150% year-over-year growth*** in both EBITDA and non-GAAP EPS," said Bill Stone, CEO.

\* \* \*

**Fiscal 2022 First Quarter Financial Results**

Total revenue for the first quarter of fiscal 2022 was $212.6 million. Total "On-Device Media" revenue, which represents revenue derived from the **Company's Application Media and Content Media platform products, increased 93% year-over-year to $120.3 million. Total "In-App Media" revenue, which represents revenue derived from the AdColony and Fyber businesses beginning on the dates when the acquisitions closed during the quarter, was $92.3 million**. *AdColony contributed $44.9 million during the quarter, while Fyber contributed $49.6 million during the quarter*. On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal first quarter of 2022 was $292.0 million, representing a 104% increase year-over-year as compared to the comparable pro forma figure for the fiscal first quarter of 2021.

71.     Later that same day, Digital filed a Form 10-Q with the SEC for period ended June 2021 ("1Q22 10-Q"), reiterating the previously reported financial results.

|  | Three months ended June 30, | |
| --- | --- | --- |
|  | **2021** | **2020** |
| Net revenues | $ 212,615 | $ 59,012 |
| Costs of revenues and operating expenses | | |
| License fees and revenue share | 138,348 | 32,300 |
| Other direct costs of revenues | 2,533 | 560 |
| Product development | 15,547 | 4,408 |
| Sales and marketing | 13,736 | 4,318 |
| General and administrative | 23,296 | 6,804 |
| Restructuring and impairment costs | 10 | — |
| Total costs of revenues and operating expenses | 193,470 | 48,390 |
| Income from operations | 19,145 | 10,622 |

72.    The Company highlighted the significant growth following the acquisition of AdColony and Fyber. In pertinent part, it stated the following:

> Net revenues increased by 264.3% ($155,949) over the comparative periods due to a combination of continuing organic growth of the Company's historical legacy business (On Device Media) and contributions from recent acquisition.

* * *

> Net revenues increased by 264.3% ($155,949) over the comparative periods due to a combination of continuing organic growth of the Company's historical legacy business (On Device Media) and contributions from recent acquisition

> License fees and revenue share are reflective of amounts paid to our carrier and OEM partners who drive the revenues generated from advertising via direct CPI, CPP, or CPA arrangements with application developers or when indirect arrangements through advertising aggregators (ad networks) are shared with our carrier and application development partners and the shared revenue is recorded as a cost of revenue. License fees and revenue share increased by 328.3% ($106,048) over the comparative periods, attributable to the increase in net revenues over the same period as these costs are paid as a percentage of our revenues. License fees and revenue share increased at a greater rate over the comparative periods than the associated revenues to which they are tied due to our acquisitions having higher contractual revenue share percentages than the legacy business.

73.     Notably, the 1Q22 10-Q included a summary regarding Digital Turbine's revenue recognition policies, stating in pertinent part:

> There have been no significant changes to the Company's significant accounting policies in Note 4, "Summary of Significant Accounting Policies," of the notes to the condensed consolidated financial statements included in its Annual Report on Form 10-K for the fiscal year ended March 31, 2021, other than the "New Accounting Standards Adopted" disclosed below and changes to the Company's segment reporting disclosed in Note 4 "Segment Information."

74.     Moreover, the 1Q22 10-Q further states that Defendants Stone and Garrison concluded that Digital Turbine's disclosures and procedures were "effective."

75.     The 1Q22 Form 10-Q included SOX Certifications signed by Defendants Stone and Garrison attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

76.     On November 2, 2021, Digital Turbine issued a press release announcing its second-quarter 2022 financial results, stating in relevant part:

> Recent Financial Highlights:
>
> - Fiscal second quarter of 2022 revenue totaled $310.2 million, representing a 338% increase year-over-year on an as-reported basis and a 63% increase year-over-year as compared to the comparable pro forma figure for the fiscal second quarter of 2021.
>
> ***
>
> Total revenue for the second quarter of fiscal 2022 was $310.2 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products, increased 73% year-over-year to $129.4 million. Before intercompany eliminations, total "In-App Media" revenue, which represents revenue derived from the Fyber and AdColony businesses, increased 61% year-over-year on a pro forma basis to $187.2 million. Fyber contributed $125.7 million during the quarter, while AdColony contributed $61.5 million during the quarter.

77.    Later that same day, Digital filed a Form 10-Q with the SEC for the period ended September 30, 2021 ("2Q22 10-Q") reiterating the previously reported financial results.

| | Three months ended September 30, | | Six months ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Net revenues | $    310,205 | $70,893 | $    522,820 | $129,905 |
| Costs of revenues and operating expenses | | | | |
| License fees and revenue share | 213,145 | 40,532 | 351,493 | 72,832 |
| Other direct costs of revenues | 3,838 | 662 | 6,371 | 1,222 |
| Product development | 17,904 | 4,217 | 33,451 | 8,625 |
| Sales and marketing | 17,479 | 4,835 | 31,215 | 9,153 |
| General and administrative | 41,307 | 8,531 | 64,613 | 15,335 |
| Total costs of revenues and operating expenses | 293,673 | 58,777 | 487,143 | 107,167 |
| Income from operations | 16,532 | 12,116 | 35,677 | 22,738 |

Over the three-month comparative periods, net revenues increased by 337.6% ($239,312), and over the six-month comparative periods, net revenues increased by 302.5% ($392,915). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions.

* * *

Over the three and six months ended September 30, 2021, total costs of revenues and operating expenses increased by $234,896 and $379,976, respectively, compared to the three and six months ended September 30, 2020. The increase in total costs of revenues was a result of continuing organic growth and the acquisitions of Appreciate, AdColony, and Fyber.

* * *

License fees and revenue share increased by $172,613 to $213,145 in the three months ended September 30, 2021, and were 68.7% as a percentage of total net revenues compared to $40,532 or 57.2% of total net revenues in the three months ended September 30, 2020.

* * *

The increase in license fees and revenue share was attributable to the increase in

total net revenues over the same period as these costs are paid as a percentage of our revenues. The increase in license fees and revenue share as a percentage of total net revenues was primarily due to our recent acquisitions having higher license fees and revenue cost percentages, which is largely due to contractual revenue share percentages that are higher than the legacy business.

78.    Moreover, the 2Q22 10-Q continued to reiterate that there … "have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber…."

79.    Furthermore, the 2Q22 10-Q noted, "[b]ased on the review of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

80.    The 2Q22 Form 10-Q included SOX Certifications signed by Defendants Stone and Garrison attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

81.    Later that same day, during an earnings call, Defendant Stone highlighted the impressive growth seen following the acquisition of Fyber and AdColony. He stated in pertinent part:

> Turning to our AdColony segment. AdColony had approximately 20% year-over-year growth comparing the September quarter to last September quarter. In particular, the AdColony brand business, which is highly strategic for our One Digital Turbine efforts, showcased approximately 40% year-over-year growth and accounts for the fastest-growing portion of AdColony revenues.
>
> * * *
>
> Turning to Fyber. Fyber's full quarterly results were impressive, showcasing year-over-year growth of over 90%. Fyber has achieved over 140% of last year's revenue in the first nine months of 2021 compared to the full year of 2020. And even more impressively, EBITDA in the same comparative period has increased over 700%.

In other words, Fyber is not only accelerating growth on the top line, but is now at that critical inflection point of scale that enables accelerating operating leverage in their core business. This impressive growth was driven by both rates and volumes.

82.    On February 8, 2022, Digital Turbine issued a press release announcing its third-quarter 2022 financial results, stating in relevant part:

> Recent Financial Highlights:
>
> - Fiscal third quarter of 2022 revenue totaled $375.5 million, representing a 324% increase year-over-year on an as-reported basis and a 38% increase year-over-year as compared to the comparable pro forma figure for the fiscal third quarter of 2021.
>
> ***
>
> Total revenue for the third quarter of fiscal 2022 was $375.5 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products before intercompany eliminations, increased 43% year-over-year to $133.6 million. Before intercompany eliminations, total revenue from our two "In-App Media" segments, which represents revenue derived from the Fyber and AdColony businesses, increased 40% year-over-year on a pro forma basis to $251.7 million. Fyber contributed $157.4 million during the quarter, while AdColony contributed $94.3 million during the quarter.

83.    That same day, Digital Turbine filed its Form 10-Q with the SEC for the period ended December 31, 2021 (the "3Q22 10-Q"), affirming the previously reported financial results. It further stated, regarding net revenues and license fees, and revenue share:

| | Three months ended December 31, | | Nine months ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Net revenue | $ 375,487 | $88,592 | $ 898,307 | $218,497 |
| Costs of revenue and operating expenses | | | | |
| License fees and revenue share | 267,722 | 50,144 | 619,215 | 122,976 |
| Other direct costs of revenue | 5,125 | 749 | 11,496 | 1,971 |
| Product development | 17,720 | 5,202 | 51,171 | 13,827 |
| Sales and marketing | 15,857 | 5,219 | 47,072 | 14,372 |
| General and administrative | 39,924 | 6,761 | 104,537 | 22,096 |
| Total costs of revenue and operating expenses | 346,348 | 68,075 | 833,491 | 175,242 |
| Income from operations | 29,139 | 20,517 | 64,816 | 43,255 |

Over the three-month comparative periods, net revenues increased by 323.8% ($286,894), and over the nine-month comparative periods, net revenues increased by 311.1% ($679,809). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions.

\*\*\*

License fees and revenue share increased by $217,578 to $267,722 in the three months ended December 31, 2021, and was 71.3% as a percentage of total net revenue compared to $50,144, or 56.6% of total net revenue, for the three months ended December 31, 2020.

\*\*\*

The increase in license fees and revenue share was attributable to the increase in total net revenue over the same period as these costs are paid as a percentage of our revenue. The increase in license fees and revenue share as a percentage of total net revenue was primarily due to our recent acquisitions having higher license fees and contractual revenue cost percentages compared to the legacy business.

84.    Digital Turbine continued with its fallacious narrative that the Company's revenues policies following the acquisition of AdColony and Fyber had "no significant changes."

85.    Moreover, Defendants Stone and Garrison concluded in the 3Q22 10-Q that "…disclosure controls and procedures were effective." However, Defendant Stone sold approximately 94,000 shares in a single trading day less than a month following this press release.

86.     The 3Q22 Form 10-Q included SOX Certifications signed by Defendants Stone and Garrison attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

### THE TRUTH BEGINS TO EMERGE

87.     On May 17, 2022, after the market closed, Digital Turbine revealed that it would restate its financial statements for the periods ended June 30, 2021, September 30, 2021, and December 31, 2021.  In particular, the release stated:

> The revenue for certain product lines of the recently acquired businesses, which are separate reportable segments, will now be reported net of license fees and revenue share, rather than on a gross basis, as had been previously reported. The changes have the offsetting effect of decreasing both revenue and license fees and revenue share in a like amount, while simultaneously increasing reported gross profit margin and Non-GAAP Adjusted EBITDA margin, in the interim financial statements for each relevant period.

88.     That same day, Digital Turbine filed a Form 8-K disclosing preliminary estimates of the scope of the restatement. It states the following:

> In connection with the integration of the Company's recently acquired businesses (AdColony Holding AS and Fyber N.V. (the "Acquired Companies")), management performed a review of the presentation of revenues and license fees and revenue share based on the accounting guidance for revenue recognition, including considerations of principal and agent (or "gross and net") presentation. After a detailed review of the Acquired Companies product lines and related contracts with customers and publishers, the Company concluded that each Acquired Company acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share. Previously, all revenues of the Acquired Companies, which are reported as separate segments referred to as In App Media – AdColony and In App Media – Fyber, respectively, were reported on a gross basis.
>
> Previously, the Company's revenues were reported as approximately $212.6 million for the three-month period ended June 30, 2021, $310.2 million for the three-month period ended September 30, 2021, and $375.5 million for the three-month period ended December 31, 2021. Based on its preliminary assessment, the Company expects that revenue on a net basis will be reported as approximately $158.1 million for the three-month period ended June 30, 2021, $188.6 million for

the three-month period ended September 30, 2021, and $216.8 million for the three-month period ended December 31, 2021.

89.     According to the same Form 8-K, "the Company's disclosure controls and procedures were not effective at June 30, 2021, September 30, 2021, and December 31, 2021."

90.     On this news, the Company's shares plummeted $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022, on unusually heavy trading volume.

91.     On May 27, 2022, the Company filed three amended 10-Q's for the periods ending June 30, 2021, September 30, 2021, and December 31, 2021 (1Q22 10-Q; 2Q22 10-Q; and 3Q22 10-Q, respectively). Each 10-Q/A reiterated the errors and ineffectiveness of disclosure controls while also providing an additional admission regarding the ineffectiveness of internal controls around accounting:

> "…***management determined the presentation and disclosure of certain hosting costs had not been conformed to our corporate accounting policy.*** As a result, certain hosting costs were classified as product development expenses rather than other direct costs of revenue and general and administrative expenses.
>
> Management concluded ***the Company's internal control for business combinations did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP***.
>
> As a result of the identification of the material weakness described above, management reassessed that ***the Company's disclosure control and procedures were not effective as of [June 30, 2021, September 30, 2021, and December 31, 2021].***

Emphasis added.

## INSIDER SELLING

92.     Before the inadequacies of the Company's policies and procedures regarding revenue recognition were fully disclosed by Digital Turbine and understood by the market, the Insider Trading Defendants Stone and Garrison sold thousands of shares while in possession of material non-public information regarding the Company's business growth and traded at high

volume.

93.    Defendant Stone sold a total of 170,580 Digital Turbine shares, while the price of the Company's stock was artificially inflated for approximately $8,608,528.45 in proceeds, while in possession of material, non-public information. As CEO, Defendant Stone knew the truth about (i) inadequacies of Digital Turbine's internal and external financial reporting regarding revenue recognition; (ii) the Company's fabricated positive statements regarding its revenue growth; (iii) AdColony and Fyber were acting as agents in certain product lines, and (iv) traded on such basis.

94.    Defendant Garrison sold 60,939 Digital Turbine shares, while the price of the Company's stock was artificially inflated for approximately $3,260,272.11 in proceeds while in possession of material, non-public information. As Executive Vice President and CFO, he knew the truth regarding (i) inadequacies of Digital Turbine's internal and external financial reporting regarding revenue recognition; (ii) the Company's fabricated positive statements regarding its revenue growth; (iii) AdColony and Fyber were acting as agents in certain product lines and (iv) traded on such basis.

**Performance Bonuses**

95.    Digital Turbine implemented an incentive compensation program, where executive officers are eligible to receive monetary bonuses based on their performance during the fiscal year.

96.    Pursuant to Defendants Stone's and Garrison's employment agreements, they are eligible to receive annual cash incentives by attainment of revenue and earnings (adjusted EBITDA) goals set by the Compensation Committee.

97.    Defendant Stone received a $737,200 performance bonus and Defendant Garrison received a $312,700 performance bonus. Defendants Stone and Garrison also received a substantial increase for fiscal 2022.

98.     For Defendant Stone, the Compensation Committee increased the fiscal 2022 annual cash incentive attainment percentages of base salary from 37.5%, 75%, and 150% of base salary to 50%, 100%, and 200%, respectively, to reward performance, encourage further Company value creation, and increase retention. In addition, for Defendant Garrison, the Compensation Committee (i) increased the fiscal 2022 annual cash incentive attainment percentages of base salary from 25%, 50%, and 100% of base salary to 37.5%, 75% and 150%, respectively, and (ii) revised the allocation of the performance goal percentage contributions to the annual incentive bonus opportunity such that the adjusted EBITDA goal would account for 50% of the annual bonus opportunity rather than 40% and the revenue goal would account for 30% of the annual bonus opportunity rather than 40%, to reward performance, encourage further Company value creation, and increase retention.

### Summary of the Individual Defendants' Wrongful Conduct

99.     The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures and allowed the prohibited activity described in this Complaint.

100.    The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over corporate accounting and business operations.

101.    The Individual Defendants breached their fiduciary duties to Digital Turbine because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, 10-Q, press releases, proxy statement, earnings call described in this complaint. Defendants signed and

authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch: that (i) AdColony and Fyber were agents in particular product lines; (ii) as a consequence, revenues for this particular product line were improperly calculated on a gross basis, as opposed to net; (iii) Company's internal controls regarding financial report were insufficient; and (iv)  as a result, Company's net revenue was overstated for fiscal 2022.

### DAMAGES TO DIGITAL TURBINE

102.    As a direct and proximate result of the Individual Defendants' conduct, Digital Turbine will lose and expend many millions of dollars.

103.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its chief executive officer, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

104.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

105.    As a direct and proximate result of the Director Defendants' conduct, Digital Turbine has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

### <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

106.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

107.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

108.    Digital Turbine is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

109.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

110.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

111.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

112.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Digital Turbine Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

113.    At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Stone, Deutschman, Chestnutt, Groos, Gyani, Karish, Sterling, and Spilman (collectively, the "Director Defendants"). Thus, Plaintiff is required to show that a majority of the Directors, i.e., four, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

114.    All of the Director Defendants are incapable of making an independent and

disinterested decision to institute and vigorously prosecute this action. Demand is excused as to all of the Director Defendants because each of them faces, individual and collectively, a substantial likelihood of liability for their misconduct that resulted from the scheme that they knowingly or recklessly engaged in  to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and ultimately decide whether to pursue action against themselves and the other perpetrators of the scheme.

115.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

116.    Moreover, the Director Defendants, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust, effective, and implemented effectively; while also ensuring that the Board's duties were being discharged in good faith and with the required diligence and due care.

117.    The Director Defendants, intending to make Digital Turbine appear more profitable and attractive to investors, knowingly and consciously reviewed, authorized and/or caused the publication of materially false and misleading statements; failed to timely correct those statements; failed to take necessary and appropriate steps to ensure the Company's internal controls were sufficiently robust, effective, and implemented effectively; and failed to take the

necessary and appropriate steps to ensure that the Board's duties were discharged in good faith with the required diligence. As a result of the Director Defendants' failure to rigorously exercise oversight of the mission critical areas of operational compliance that resulted in the foregoing, the Director Defendants breached their fiduciary duties of loyalty and good faith; are facing a substantial likelihood of liability; are not disinterested; and demand upon them is futile and therefore, excused.

118.    Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

119.    Additionally, each of the Directors Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Stone**

120.    Defendant Stone is not disinterested or independent and therefore, is incapable of considering demand because Stone (CEO) is an employee who derives substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

121.    This lack of independence and financial benefits received by Stone renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

122.    In addition, Defendant Stone, while in possession of material non-public information, sold a minimum of 170,580 shares of the Company's stock at various prices per

share for a windfall of $8,608,528.45.

123.    Lastly, Defendant Stone is a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

124.    As such, Defendant Stone cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

## **Defendants Deutschman, Chestnutt and Groos**

125.    Defendants Deutschman, Chestnutt, and Groos are not disinterested or independent, and therefore, are incapable of considering demand because they served on the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements.  Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's business growth related to customer retention and digital technology sales. Further, these Defendants Deutschman, Chestnutt, and Groos reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, these Defendants Deutschman, Chestnutt, and Groos caused these improper statements.

126.    This lack of independence and financial benefits received by Defendants Deutschman, Chestnutt, and Groos renders them incapable of impartially considering a demand to commence and vigorously prosecute this action.

127.    For these reasons, Defendant Deutschman, Chestnutt, and Groos breached their fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendants Gyani, Karish and Sterling**

128.     Defendant Gyani, Karish, and Sterling are not disinterested or independent and therefore, are incapable of considering demand because they served on the Compensation and Human Capital Management Committee. Defendants Gyani, Karish, and Sterling were charged with evaluating the CEO's performance, and their failure to properly do so makes them culpable for the wrongful conduct described herein. They conducted little, if any, oversight of the Company's performance and shareholder return. They consciously disregarded their duties to consider a number of factors when assessing the incentive component of executive compensation, including the performance bonuses, which incentivized Individual Defendants to overreport revenue through improper means.

129.     In addition, Defendants Gyani and Sterling served on Nominating and Corporate Governance Committee, and as part of their duties, were required to provide a review, guidance, and oversight for the overall operations of a corporation or business. They failed to review regulatory developments and governance best practices that would best serve the interest of Digital Turbine's stakeholders. Good corporate governance leads to ethical business practices, which leads to financial viability. Defendants Gyani and Sterling willfully neglected and failed to ensure the Company's effectiveness of the Board's leadership structure or recommend to the Board any proposed change to such structure, as they allowed board members to disseminate material misinformation regarding the regulatory misconduct violations and inaccurate positive revenue growth.

130.     This lack of independence and financial benefits received by Defendant Gyani, Karish and Sterling render them incapable of impartially considering a demand to commence and vigorously prosecute this action.

131.    For these reasons, Defendants Gyani, Karish and Sterling breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

132.    The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code requires the Directors to also adhere to Digital Turbine's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct.  The Directors violated the Code because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

133.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have a longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand for the Directors would be futile.

134.    Digital Turbine has been and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Digital Turbine any part of the damages Digital Turbine suffered and will continue to suffer,

thereby. Thus, any demand for the Directors would be futile.

135.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their misconduct violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

136.    The acts complained of herein constitute violations of fiduciary duties owed by Digital Turbine's officers and directors, and these acts are incapable of ratification.

137.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Digital Turbine. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Digital Turbine, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

138.    If there is no directors' and officers' liability insurance, then the Directors will not cause Digital Turbine to sue the Individual Defendants named herein since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

139.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants For Breach of Fiduciary Duties

140.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Digital Turbine's business and affairs.

142.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Digital Turbine.

143.    In breach of their fiduciary duties owed to Digital Turbine, the Individual Defendants willfully or recklessly caused the Company to issue statements about the Company's business operations, and prospects that lacked a reasonable basis thereby violating federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

144.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Digital Turbine's securities.

145.    The Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls. Moreover, the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein and that internal controls were not adequately maintained or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Digital Turbine's securities.

146.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

147.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Digital Turbine has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.     Plaintiff, on behalf of Digital Turbine, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants For Waste of Corporate Assets

149.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders of the Company.

151.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Digital Turbine to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

Plaintiff, on behalf of Digital Turbine, has no adequate remedy at law.

## THIRD CLAIM

### Against the Insider Trading Defendants for Breach of Fiduciary Duties and Disgorgement

153.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Insider Trading Defendants were unjustly enriched at the expense of, and to the detriment of, Digital Turbine.

155.     The Insider Trading Defendants had access to non-public information concerning

Digital Turbine.

156.    The Insider Trading Defendants are fiduciaries of Digital Turbine, possess material, non-public information of Digital Turbine, and used that information improperly in selling Digital Turbine stock because they were motivated, in whole or in part, by the substance of that material, non-public information of Digital Turbine, and acted with scienter.

157.    The Insider Trading Defendants profited from their misconduct and their exploitation of material and adverse inside information.

158.    The other Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Digital Turbine that was tied to the performance or artificially inflated valuation of Digital Turbine, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

159.    Plaintiff, as the representative of Digital Turbine, seeks disgorgement of all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Insider Trading Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **FOURTH CLAIM**

**Against Defendants Stone and Garrison for Contribution Under Sections 10(b) and 21D of the Exchange Act**

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Digital Turbine, along with Defendants Stone and Garrison, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of  Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

162.    If and when the Company is found liable in the Securities Class Action for these misconduct violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Stone's and Garrison's willful and/or reckless misconduct violations of their obligations as controlling shareholder, officers, and/or director of Digital Turbine.

163.    Defendants Stone and Garrison, because of their positions of control and authority as controlling shareholders, officers, and/or directors of Digital Turbine, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Digital Turbine, including the wrongful acts complained of herein and in the Securities Class Action.

164.    Accordingly, Defendants Stone and Garrison are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

165.    As such, Digital Turbine is entitled to receive all appropriate contributions or indemnification from Defendants Stone and Garrison.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)    Declaring that the Plaintiff may maintain this action on behalf of Digital Turbine, and that Plaintiff is an adequate representative of the Company;

b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Digital Turbine;

c)       Determining and awarding to Digital Turbine the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)       Directing the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Digital Turbine and its shareholders from a repeat of the damaging events described herein;

e)       Awarding punitive damages;

f)       Awarding Digital Turbine restitution from Individual Defendants, and each of them;

g)       Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

h)       Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 16, 2022

Respectfully Submitted,

/s/ *William B. Federman*
William B. Federman, Esq. (TX Bar #00794935)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Phone: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com
-and-
212 W. Spring Valley Road
Richardson, TX 75081

**AND**

Justin A. Kuehn *
Fletcher W. Moore*
**MOORE KUEHN, PLLC**
30 Wall Street, 8th floor
New York, New York 10005
Tel: (212) 709-8245
jkuehn@moorekuehn.com
fmoore@moorekuehn.com
*Pro hac vice application forthcoming*

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Peter Votto, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Digital Turbine, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this <u>15</u> day of September 2022.

*Peter Votto*
Peter Votto (Sep 15, 2022 09:48 EDT)
PETER VOTTO